THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. W.T., Defendant-Appellant.

Second District  No. 2—92—0015

Opinion filed January 6, 1994.

G. Joseph Weller, Ingrid L. Moller, Thomas A. Lilien, and Ingrid Lehnert, all of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Defendant, W.T., was found guilty by a jury in the circuit court of Lake County of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14(b)(1) (West 1992))). Subsequently, defendant's post-trial motion for judgment notwithstanding the verdict or for a new trial was denied by the court, and defendant was sentenced to 11 years' imprisonment. Defendant appeals, contending: (1) that he was not found guilty beyond a reasonable doubt because the complainant's version of alleged sexual assault was contrary to medical evidence; (2) that he was denied the effective assistance of counsel when defense counsel failed to tender instructions on aggravated criminal sexual abuse; and (3) that the 11-year sentence imposed upon him was excessive.

Following a hearing pursuant to section 115—10 of the Code of Criminal Procedure of 1963 regarding the admissibility of hearsay statements (Ill. Rev. Stat. 1991, ch. 38, par. 115—10 (now 725 ILCS 5/115—10 (West 1992))), the cause proceeded to a jury trial. At trial 18-year-old Renee Berg testified that she had been baby-sitting for the complainant, B.Z., and her younger brother, S.T., for nearly two years. The children's mother would bring them to Berg's house at about 2:30 p.m. on her way to work. Defendant would pick them up at about 12:30 a.m. when he got off work.

Berg related that prior to putting B.Z. to bed on June 26, 1991, she mentioned to B.Z. that defendant was going to pick her up. Berg recalled that B.Z. began crying and told Berg that her daddy was doing "the nasty" to her. B.Z. said that when defendant took her and her brother home, defendant would put S.T. to bed in the bedroom and then bring B.Z. out on the couch. He would then take her panties down, remove his pants, pull his underwear down, get on top of her, and "pee pee" on her vagina. B.Z. told Berg not to tell defendant what she had related to Berg because defendant told B.Z. that he would "kick her ass if she said anything."

Berg stated that she instructed B.Z. to tell her mother about defendant's conduct after defendant left for work the next day. Berg did not try to telephone B.Z.'s mother at the time B.Z. told her about the conduct. Berg knew the mother had already left work for her second job, and Berg would be unable to contact her. Berg admitted that she did not contact the police, the Department of Children and Family Services, or any other State child welfare agency. Berg explained that she thought the correct procedure to follow in this instance was for

B.Z. to tell her mother. Berg acknowledged that she had never known B.Z. to exaggerate or to tell fibs or lies.

Berg testified that B.Z. had cried on three prior occasions at Berg's house, saying that she did not want to go home with defendant. On those occasions, B.Z. did not give any reasons for not wanting to go with defendant. Berg acknowledged that when defendant arrived to pick B.Z. and her brother up on the date in question, B.Z. did not cry, did not run and hide or grab on to Berg, and did not refuse to accompany defendant.

B.Z.'s mother, Pamela T., testified that she had known defendant for 5½ years and had lived with him about a year and a half prior to marrying him. At the time of trial the couple had been married one year. Pamela was employed as a nurse, working from 3 to 11 p.m. at one job and from 11 p.m. until 7 a.m. at another job.

Pamela recalled that after defendant left for work at noontime on June 27, 1991, B.Z. came into her bedroom, stating that she wanted to talk with her mother. B.Z. told her mother that defendant had been doing nasty things to her. When Pamela asked B.Z. what she meant by "nasty things," B.Z. explained that defendant had been making love to her by putting his penis in her vagina. B.Z. described how defendant would take her into the living room after he was certain S.T. was asleep in the bedroom, take her clothes off and undress himself, and then put her on his lap. He would then put his penis in her vagina and move her around on his penis. Pamela explained that B.Z. knew the correct terminology for the different parts of the body. Pamela had taught them to B.Z. after reading that children should learn the actual names of body parts.

Pamela stated that B.Z. said defendant had made love to her twice during the preceding night. B.Z. told her mother that she tried to run away from defendant, but he brought her back into the living room and "peed on" her again. When B.Z. threatened to tell her mother, defendant allegedly spanked B.Z., forced her face into a pillow, and told her that she better not tell. Pamela conceded that B.Z. did not cry when telling her about these incidents.

Pamela took B.Z. to the Vernon Hills police department after B.Z. agreed to tell the police about defendant's conduct. At the station, Pamela spoke with Detective Davies and Detective McPhee, who then talked to B.Z. alone.

According to Pamela, B.Z. did not exaggerate or lie and was not a mean person; she liked defendant. Pamela conceded that B.Z. accused defendant of placing his penis in her mouth but stated that this accusation occurred after Pamela and B.Z. had gone to the police de-

partment regarding the incident in question. Pamela acknowledged that she had not told the police of any additional statements made by B.Z. regarding sexual abuse.

Pamela recalled that in the past when she gave B.Z. a bath, she sometimes noticed swelling of her vagina and some rectal bleeding. She had not noticed any contusions or abrasions on the vagina.

Detective Drew McPhee of the Vernon Hills police department testified that he spoke with Pamela on June 27, 1991. Pamela related that B.Z. had told her about some incidents of a sexual nature involving the child and her stepfather. McPhee talked to B.Z. without Pamela present and asked the child to tell him what she had told her mother. B.Z. told McPhee that after defendant picked her brother and her up at Berg's house, he told her in the car that when they got home, he was going to do all the things he wanted to do with her. When B.Z. told him "no," defendant said he would "kick her ass" if she mentioned anything to her mother. After they arrived home, S.T. went to bed, and B.Z., wearing a green T-shirt, fell asleep on the living room couch. She was later awakened by her stepfather. B.Z. told McPhee that she tried to run from the living room to her bedroom, but defendant grabbed and took her to the couch. Defendant sat down on the couch, pulled down his underwear, placed B.Z. on top of him, straddling and facing him, and then inserted his penis into her vagina. According to B.Z., defendant made up-and-down motions with his hips until he "went pee." B.Z. did not indicate to the officer, nor could he recall if he asked her, how far defendant inserted his penis into her vagina.

After this incident, B.Z. said she ran to her bedroom and lay down. Defendant followed her and warned her not to tell her mother or else he would kick her ass. He then rolled her over on the bed and pushed her face down into the pillow. He also swatted her buttocks and rear portion of her legs three times with a flyswatter. Then, he brought B.Z. back to the living room couch, again pulled down his underwear, placed her, facing him, on top of him, inserted his penis into her vagina, and peed again. B.Z. said she got down and went to the bathroom to clean herself up with a washcloth. After that, she was allowed to go to her bedroom to sleep. When McPhee asked B.Z. how often this conduct occurred, she initially replied that defendant did this whenever her mother went to work but then limited the conduct to five times.

Detective McPhee acknowledged that B.Z. was not crying at the police department. She was not meek but appeared "normally shy for a five year old." The officer did not notice any bruises, cuts, or bleed-

ing on B.Z. She walked with a normal gait and did not appear to be in any pain. Also, she did not tell him that her vagina hurt.

McPhee related that after interviewing B.Z. he took her to the hospital where she was examined for any sign of trauma to her vaginal area. While at the hospital, B.Z.'s purple and white underpants, which she indicated she had been wearing the preceding night, were taken and submitted to the Northern Illinois Crime Lab for testing.

Six-year-old B.Z. testified that defendant gives her bad touches when he picks her up at Berg's house and takes her home. She stated that defendant puts S.T. to bed and then makes love to her. B.Z. used anatomically correct dolls to demonstrate what defendant does to her.

B.Z. said that she remembered the night when she cried at Renee's after Renee told her defendant was going to pick her up. She recalled that she told Renee she did not want to go home with her stepfather because he would do "the nasty" with her. She explained "the nasty" meant to make love to her. B.Z. acknowledged that when defendant came to pick her up at Renee's house, she did not cry or try to hide but got into the car with defendant. B.Z. said that she did not tell Renee that she did not want to go with defendant because she could not say that out loud.

According to B.Z., defendant did not say anything on the drive home that night. At home defendant put S.T. to bed and told B.Z. to sleep on the living room couch. B.Z. said that defendant told her he was going to watch television but that he lied. Instead, he took off his clothes and B.Z.'s green T-shirt and purple and white panties and told her to sit on his lap. B.Z. recalled that defendant put his penis in her vagina and wiggled around. B.Z. said that whenever defendant makes love to her, he pees on her. B.Z. described the appearance of defendant's penis in its erect position and stated that she saw it enter her vagina although she could still see half of it. At one point, she demonstrated with the doll that only the tip of the penis entered her vagina. B.Z. recounted that it made her vagina turn red and burn.

It was B.Z.'s testimony that defendant told her that he would give her a candy bar if she did not tell anyone what he did. But, if she did tell, he would hurt her. B.Z. thought that defendant had made love to her six times in the past, but she was not certain. At one point, B.Z. acknowledged that defendant had made love to her six times on the night in question.

B.Z. stated that after defendant made love to her, she ran to her bedroom and got into the bed she shared with her brother. B.Z. whispered to herself that she was going to tell her mother, but defendant overheard her and came into the room. He pushed her head into the

pillow and hit her with a flyswatter. B.Z. said that she was crying, but not loud, and her brother did not wake up.

B.Z. recalled that one time defendant showed her a "nasty movie" where the people got undressed and started making love. B.Z. stated that defendant told her it was on cable. But, B.Z. said, it was a tape. B.Z. indicated that she closed her eyes when she was watching the movie.

B.Z. testified regarding the family's laundry habits. According to B.Z., the family's clothes, with the exception of the towels and some of defendant's clothing, were put in the hamper in the bathroom closet.

B.Z. also testified as to an incident involving her cousin, S.H., and the cousin's father. B.Z. said that S.H. had told her that her father had touched her vagina. When that occurred, B.Z. told S.H. about what defendant had done to her. According to B.Z., she had already told Renee about defendant's conduct prior to her telling her cousin. B.Z. denied that she was making up what defendant did to her because she wanted to be like her cousin. B.Z. stated that she understood what it meant to tell the truth, that she was telling the truth about defendant's conduct towards her, and that she was not lying.

William Wilson, a forensic serologist with the Northern Illinois Police Crime Lab, testified that he tested the crotch of B.Z.'s underwear pants for seminal stain. From the stain he took a sample the size of a pinhead. On that one sample he found seven spermatozoa heads. Wilson acknowledged that he could not say positively whether the semen in the complainant's panties came from defendant. But, he could not eliminate defendant as a possible source.

Wilson acknowledged on cross-examination that tests on B.Z.'s green T-shirt and on a washcloth tested negatively for the presence of sperm. He found no pubic hairs or fibers in the panties. Wilson said that if a fluid came into contact with the outside of the panties, it would normally be absorbed into the material. Wilson testified, on redirect, that the stain in B.Z.'s panties was on the inside crotch.

At the close of the State's case, defendant moved for a directed verdict, which the trial court denied.

Defendant then called his wife, Pamela, as his first witness. Pamela acknowledged that she and defendant argued sometimes but rarely in front of B.Z. and her brother. Pamela denied having arguments about sex in front of the children.

Pamela did not recall telling the nurse who was present when B.Z. was examined at the hospital that B.Z. had spent some time with her cousin, S.H., on the previous day. Nor did Pamela recall telling

the nurse that she had serious doubts regarding B.Z.'s statement that she had been sexually assaulted. Pamela acknowledged that she did not want to believe B.Z. but that she did believe her daughter when B.Z. told her about defendant's conduct.

Pamela admitted that sometimes she received sexually explicit materials through the mail but that they were not left out where the children could see them. She had never seen B.Z. looking at such materials. After the incident in question, B.Z. told her mother that defendant had shown her a pornographic tape on which people were doing the "nasty."

Elaine Hastings, a nurse working in the emergency room of Condell Medical Center on June 27, 1991, remembered B.Z. being brought in for an examination because of an alleged sexual assault. Hastings recalled a conversation with the child's mother. The mother admitted that the child had told her on prior occasions about sexual abuse but that she had not believed her daughter because the child had been playing with her cousin who had recently been sexually abused.

Hastings stated she was present during the doctor's examination of B.Z. He examined her genitalia externally. The external area had no trauma to it. Hastings noticed no swelling or abrasions and there was no discharge or bleeding present. She did notice some redness on B.Z.'s vagina, and B.Z. stated that her vagina had been bothering her. Hastings recalled that the doctor examining B.Z. did not do an internal examination except for a finger digit test. He told the nurse that B.Z.'s hymen was intact.

Hastings said that she had taken several reports on sexual abuse in the five years that she had worked at the hospital. She acknowledged that the hospital had no sexual assault unit. Hastings related that she asked B.Z. why her mother had brought her to the hospital. B.Z. responded that her stepfather had picked her up and put her down on his penis so that it went all the way inside her. Hastings acknowledged that the hospital had no dolls, charts, or other aids that a child could use to show what happened to her. The nurse said B.Z. pointed to her own body parts in relating defendant's conduct.

Doctor Craig Dean, the emergency physician on duty at Condell Medical Center, on June 27, 1991, testified that he examined B.Z. for possible sexual assault. He visually examined her genitalia and inspected the perineal area for evidence of bruises, bleeding, or other abnormal findings; he found none. He attempted to inspect B.Z.'s hymen to see if it could be penetrated with his finger. At that time, the exam apparently became painful for the child because B.Z. started to

close her legs. The doctor ceased his probing but stated that he was reasonably convinced that the child's hymen was intact.

Dean stated that he had very limited experience in examining five-year-old or six-year-old girls. But, he thought the examination was fairly normal. The doctor said that he detected nothing which indicated that B.Z. had had prior sexual contacts. He did not recall noticing any abnormal redness of the genitalia or any abnormal color in the vaginal area or the labia. Because the complainant's hymen was tight when he touched it with his finger, the doctor concluded that it was very unlikely that B.Z. was penetrated by an erect penis. As a result, the doctor did not order a vaginal culture since he believed that he would have to use a general anesthetic on B.Z. to obtain a specimen.

On cross-examination, Dr. Dean acknowledged that the hospital did not have a sexual abuse unit. He stated that he sees perhaps one sexual abuse case a year of this nature and admitted that he is "not an expert at all." The doctor also admitted that the legal definition of "penetration" differs from the medical definition. It was his understanding that the legal definition was "just to have the penis be in direct contact with the perineal cavity or outside the vagina." He acknowledged that his opinion as to whether B.Z.'s vagina had been penetrated was based on the medical definition and not on the legal definition. The doctor stated that if just the head of the penis came into contact with the labia, which is an external genital organ, it would be possible for the glands of the penis to ejaculate semen and the complainant's hymen to remain intact.

Defendant, W.T., testified in his own behalf with the aid of an interpreter. Defendant stated that he came from Ethiopia in 1986. Although he had been married to Pamela for only a year, he had known her for more than 5½ years. S.T. was their son. B.Z. was defendant's stepdaughter, but he said that had he cared for her since she was 10 months old.

Defendant said that B.Z. learned that defendant was not her biological father approximately one year ago. According to defendant, she then began making allegations of sexual abuse, telling her mother that defendant put his penis in her mouth. When Pamela confronted defendant with this allegation, he suggested that they take B.Z. to the Children's Advocacy Center to learn the truth. Defendant recalled that Pamela commented that she knew her family made up things and that she trusted him.

Defendant stated that he worked the 4:15 p.m. to 12:30 a.m. production shift at Abbott Laboratories. On June 26, 1991, his wife called and asked him to pick up the children at Berg's house after work.

Defendant recounted that after he got off work at 12:30 a.m. on June 27, he went to pick up the children at Berg's house. When he appeared at Berg's house, B.Z. did not cry, nor did she say she did not want to accompany him. When he and the children arrived home, defendant fed them and told them to go to bed. According to defendant, B.Z. did not fall asleep on the couch. She and her brother went to bed at the same time in the bed that they shared. Defendant said that he took a shower, had dinner, and went to bed. He woke up when his wife came home between 7:45 and 8 a.m. Defendant said that she changed her clothes and came to bed. When defendant left for work about 12:30 p.m., the children were watching TV. S.T. said good-bye to defendant; B.Z. did not say anything.

Defendant explained that the children's clean clothes were kept in a dresser drawer in the parents' bedroom and that B.Z. and her brother would drop their dirty clothes wherever they changed into their clean clothes. With the exception of defendant's pants, the family's dirty clothes, as well as dirty bed sheets and towels, were put into the hamper in the bathroom. Defendant testified that the children sometimes put on dirty clothes when there were no clean clothes to wear. Occasionally, they wore something dirty because it was an article of clothing they especially liked, and they did not care if it was dirty. Defendant said that he had seen the children put on dirty underwear many times.

According to defendant, after he had sexual intercourse with his wife, he would wipe the semen off himself with a towel and put the towel with the dirty clothes in the hamper. Sometimes, his wife just slept without cleaning herself, and sometimes she went to the bathroom to clean herself. Most of the time, defendant testified, she cleaned off herself with any clothes she could reach nearby and then dropped the soiled clothes on the floor. Sometimes, she put them into the hamper.

Defendant stated that he and his wife had had arguments regarding sex in front of B.Z. Most of the time when these arguments occurred, B.Z. would tell defendant that if he argued with her mother, he would go to jail.

Defendant acknowledged that there was a pornographic movie in the house which his wife bought through the mail. Defendant denied ever watching the movie with B.Z. According to defendant, the movie was kept on the top shelf of the hall closet but sexually explicit maga-

zines and books were kept in a small table in the living room. Once, defendant saw his son with one of the magazines. S.T. told defendant that he and B.Z. were looking at the pictures.

Defendant testified that B.Z. played frequently with her cousin S.H. He recalled one unusual instance when B.Z., S.T., and S.H. were naked and touching each other. Defendant said that he advised his children that such play was not proper. When he asked B.Z. why she had engaged in such play, she said that her cousin had forced her. Defendant told his wife that he did not want the children to play with S.H. anymore. Pamela responded that it was none of his business and allowed the children to continue playing with their cousin.

Defendant described for the jury the size of his erect penis, between five and seven inches long with a circumference between 1½ to 2 inches. Defendant denied ever having intercourse or any other sexual contact with B.Z.

Following deliberations and several inquiries, the jury found defendant guilty on one count of aggravated criminal sexual assault committed on or about June 27, 1991. The jury acquitted defendant on another count of aggravated criminal sexual assault, allegedly committed between May 1 and June 26, 1991, and on a count of aggravated criminal sexual abuse, committed between September 1, 1990, and June 26, 1991, when defendant allegedly sucked on B.Z.'s breast.

Subsequently, the trial court denied defendant's post-trial motion and sentenced him to a term of 11 years' incarceration. This appeal ensued.

Defendant first contends that the evidence adduced at trial was insufficient to find him guilty beyond a reasonable doubt. In particular, defendant challenges the complainant's testimony, arguing that no rational trier of fact could have convicted him of aggravated criminal sexual assault since B.Z.'s version of alleged sexual assault was contrary to the medical evidence.

The State contends that defendant's argument is based primarily on the theory that B.Z.'s testimony was neither clear nor convincing and was entirely uncorroborated. As the State correctly points out, however, whether a victim's testimony is clear and convincing or substantially corroborated is no longer the standard of review in a sex offense case. (*People v. Schott* (1991), 145 Ill. 2d 188, 202.) Rather, where the evidence is claimed to be insufficient on review, as is the case here, the appropriate standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (145 Ill. 2d at 203.) Reviewing all the evidence in

the prosecution's favor, and not just that evidence selectively set out by defendant, we find that the jury could have found the essential elements of aggravated criminal sexual assault beyond a reasonable doubt.

An accused commits aggravated criminal sexual assault if "the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14(b)(1) (West 1992)).) The evidence at trial showed that defendant was 29 years old and B.Z. was five years old at the time of the alleged sexual assault. The basis of defendant's argument is that no act of sexual penetration occurred as evidenced by the testimony of the physician who examined B.Z. following the alleged sexual assault.

Dr. Craig Dean, the emergency room physician who examined B.Z., admitted that he had no specialty in obstetrics or gynecology and very little experience in examining five- or six-year-old girls. He also indicated that he saw perhaps one instance of sexual abuse per year. The doctor stated that he was "barely" able to penetrate B.Z.'s hymen with his finger. At the instance that the doctor attempted to penetrate it, B.Z. apparently found the examination painful so she started to close her legs. Based on the fact that her hymen was tight to the touch, Dr. Dean said he was "reasonably convinced" that B.Z.'s hymen was intact and that it was unlikely that it was penetrated by an erect penis. As a result, he did not order a vaginal culture, especially since he would have to use a general anesthetic on B.Z. to obtain it.

Dr. Dean acknowledged that the medical definition of "penetration" differed from the legal definition. His definition of penetration, medically, "would be the penis would enter through the hymen opening which is the gatekeeper, if you will, to the vagina which is an internal conduit." His understanding of the legal definition of penetration was that the penis just "be in direct contact with the perineal cavity or outside the vagina." He admitted that his opinion regarding whether B.Z.'s vagina had been penetrated was based on the medical definition of penetration rather than the legal definition. The doctor also testified that if just the head of the penis came into contact with the labia, i.e., the inner and outer folds of a female's external genital organs, it would be possible for the glands of the penis to ejaculate semen outside, and the hymen to remain intact.

■ Despite defendant's assertions to the contrary, it is not clear from her testimony that B.Z. meant that defendant penetrated her

vagina with the entire length of his erect penis. As the State points out, defense counsel made every attempt to confuse B.Z. on this matter. Nevertheless, there was testimony to the contrary wherein B.Z. indicated that only about two inches of defendant's penis was inserted into her genital area.

The jury was instructed on the legal definition of sexual penetration pursuant to Illinois Pattern Jury Instructions, Criminal, No. 11.65 (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d). The instruction provided:

> "The term 'sexual penetration' means any intrusion, however slight, of any part of the body of one person into the *sex organ* of another person, including but not limited to cunnilingus, fellatio, or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." (Emphasis added.) (See IPI Criminal 2d No. 11.65.)

This court has previously held that the female "sex organ" is not limited to the vagina but also includes the labia majora and labia minora, the outer and inner folds of skin of the external genital organs. See *People v. Ikpoh* (1993), 242 Ill. App. 3d 365, 381-83; see also *People v. Hebel* (1988), 174 Ill. App. 3d 1, 31-32.

Defendant's theory throughout the instant case is that no vaginal penetration was proven. However, according to the definition set out above, vaginal penetration is not necessary to constitute sexual penetration under Illinois law. The State need only show "any intrusion, however slight." Consequently, if defendant only rubbed the head of his penis against B.Z.'s labia minora or labia majora, he was guilty of sexual penetration under the statute. B.Z.'s testimony as well as the presence of semen in her underwear was sufficient for the jury to find such sexual penetration.

Defendant attempts here, as at trial, to explain the presence of the semen in B.Z.'s panties by relying on the fact that all family members placed their dirty laundry in the same hamper, implying thereby that the semen was somehow transferred to B.Z.'s underwear through contact with some other article of soiled clothing which had semen on it. We find this theory farfetched, especially in light of the fact that there was no testimony that defendant and his wife had had sex recently so as to establish the possible presence of semen on any article in the hamper. Moreover, although there was testimony by a serologist that a fluid which came into contact with the outside of B.Z.'s panties would normally be absorbed into the pant material, the seminal stain examined by the serologist was found on the inside crotch of the panties. Additionally, defendant misleads the court re-

garding the number of spermatozoa heads which were found by the serologist when he examined the seminal stain, stating that he found only seven. Although we fail to grasp the significance of this statement, defendant overlooks the fact that the serologist testified that he took only a pinhead-sized specimen from the seminal stain and that he stopped counting spermatozoa when he reached number seven.

Defendant also attempts to downplay the presence of semen in B.Z.'s panties by pointing out that no semen was found on the washcloth B.Z. said she used to clean herself after the encounter with defendant. Defendant maintains that this fact proves the falsity of B.Z.'s account of what happened on June 27. Defendant ignores the fact, however, that there was testimony that Pamela had used the same washcloth when she took a shower on the morning of June 27.

Defendant also tries to show the untruthfulness of B.Z.'s account by pointing out that she often played with her six-year-old cousin, S.H., who the evidence showed had been reportedly sexually abused by her father. Defendant argues that S.H.'s influence on B.Z. and B.Z.'s desire to emulate S.H.'s experiences caused B.Z. to make up the incident involving defendant and her. However, despite defense counsel's confusing and inconsistent questioning regarding this matter, six-year-old B.Z. did not allow counsel to put words in her mouth. She denied always wanting to do things that S.H. does.

Although B.Z. conceded that she wanted to have the same experiences her cousin had, it was brought out on redirect examination that B.Z. did not know what the word "experience" meant. Additionally, it was shown on redirect examination that at the time S.H. told B.Z. that her father (S.H.'s) had touched S.H.'s vagina, the incident in question involving B.Z. had already occurred. Consequently, defendant's theory that B.Z. created the incident after talking with her cousin was not supported by the evidence. Moreover, as the State points out, S.H.'s alleged influence on B.Z. and B.Z.'s "story" could not account for the presence of semen in the complainant's underwear on the date of the incident in question.

The jury is charged with the responsibility of weighing the credibility of the witnesses and resolving any conflicts and inconsistencies in their testimony, and normally a court of review will not substitute its own judgment in that regard. (*People v. Schott* (1991), 145 Ill. 2d 188, 206.) A jury's determination of a defendant's guilt or innocence is entitled to great deference, and when the sufficiency of the evidence is challenged, this court will not retry the defendant although it is our duty to set aside a conviction when the evidence raises a reasonable doubt of defendant's guilt. (*People v. Boclair* (1989), 129 Ill.

2d 458, 474.) Viewing the evidence, here, in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of aggravated criminal sexual assault. We conclude, therefore, that the jury's finding was not so unsatisfactory, unreasonable, or improbable as to raise a reasonable doubt of defendant's guilt. *People v. Haun* (1991), 221 Ill. App. 3d 164, 174.

Next, defendant contends that he was denied the effective assistance of counsel because defense counsel failed to tender any instructions on aggravated criminal sexual abuse as a lesser-included offense to aggravated criminal sexual assault. Defendant acknowledges that the testimony of the six-year-old complainant in combination with the medical evidence presented may have been sufficient to convince the jury that some sort of sexual conduct occurred. Defendant maintains, however, that with no instruction providing a lesser alternative to choose from, in particular an instruction pertaining to aggravated criminal sexual abuse as a lesser-included offense of aggravated criminal sexual assault, the jury felt compelled to convict defendant of the greater Class X offense. Thus, defense counsel's failure to tender such an instruction constituted ineffective representation.

To establish ineffective assistance of counsel defendant must prove that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 688, 695, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068.) The fundamental concern is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

When evaluating ineffective representation claims, this court will not extend its review to areas involving the exercise of judgment, trial tactics or strategy (*People v. McNutt* (1986), 146 Ill. App. 3d 357, 368), as even the best attorneys would not necessarily agree on the same strategy for a particular case. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance" and judge counsel's performance not in hindsight but from his perspective and on the basis of all the facts and circumstances at the time of trial. 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Defendant's argument here, as in his first issue, revolves around his theory that he could not have been found guilty of sexual assault

since there was no proof that he vaginally penetrated his stepdaughter. Consequently, defendant asserts, had defense counsel not erred in failing to tender an instruction providing that sexual abuse was a lesser-included offense of sexual assault, the result of his trial would have likely been different.

The indictment charging defendant with aggravated criminal sexual assault stated in relevant part:

> "[D]efendant, who was 17 years of age or older, knowingly committed an act of sexual penetration with [B.Z.], who was under 13 years of age when the act was committed, in that the said defendant placed his penis in the vagina of [B.Z.], in violation of Section 12—14(b)(1) of Chapter 38 of the Illinois Revised Statutes." (See Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14(b)(1) (West 1992)).)

The words "placed his penis in the vagina of [B.Z.]" were not essential to support a charge of aggravated criminal sexual assault. Rather, the words constituted mere surplusage. (See *People v. Priola* (1990), 203 Ill. App. 3d 401, 410-11.) Evidence that defendant committed any act of sexual penetration was sufficient to support his conviction. The instructions pertaining to the charge of aggravated criminal sexual assault informed the jury of that fact. The jury was instructed that to sustain the charge of aggravated criminal sexual assault the State had to prove that defendant "committed an act of sexual penetration." (IPI Criminal 2d No. 11.35.) The jury was further instructed that any slight intrusion of the complainant's sex organs established sexual penetration under Illinois law (IPI Criminal 2d No. 11.65). We have already determined that the evidence was sufficient for the jury to have found that such an intrusion occurred.

■ Due process requires that an instruction on a lesser-included offense be given only when the evidence so warrants. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 426.) Here, as the State points out, the evidence established that either defendant was guilty of aggravated criminal sexual assault in that he penetrated B.Z. as the term is defined by law (Ill. Rev. Stat. 1991, ch. 38, par. 12—12(f) (now 720 ILCS 5/12—12(f) (West 1992))) or he was not guilty. Defendant emphatically denied that he committed any acts of sexual misconduct involving B.Z.; his was an "all or nothing defense." This remained his position even at the time of sentencing. While it is easy on hindsight to scrutinize a counsel's conduct and to point out how he should have performed, this court must "evaluate the conduct from counsel's perspective at the time." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) At the time of the jury instructions confer-

ence, defendant's position was that he was not guilty at all. Consequently, it is reasonable to assume that defense counsel intended to present the jury with only two alternatives, guilty of aggravated criminal sexual assault or not guilty. See *Palmer*, 188 Ill. App. 3d at 427.

The decision whether to offer an instruction on a lesser-included offense is one of strategy which has no bearing on the competency of counsel. (*Palmer*, 188 Ill. App. 3d at 428.) By proffering such an instruction in the instant case, defense counsel risked interfering with his own strategy that defendant was not guilty, at all, of any sexual conduct involving his stepdaughter. As a result, we do not find that defense counsel's failure to tender a lesser-included offense instruction fell below an objective standard of reasonableness. Accordingly, defendant was not denied the effective assistance of counsel.

In his final contention, defendant argues that the trial court abused its discretion in sentencing him to 11 years' imprisonment. Defendant maintains that his sentence was "well in excess of the minimum of six years for the Class X felony of aggravated criminal sexual assault" and that it does not reflect that the trial court gave proper consideration to the facts that defendant lacked any prior criminal history, was gainfully employed, and faced deportation as a consequence of his conviction. As the State points out, however, defendant's argument ignores the simple fact that his sentence is far less than the maximum allowable sentence of 30 years' imprisonment. See Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(3) (now 730 ILCS 5/5—8—1(a)(3) (West 1992)).

In considering the propriety of a sentence, this court must give great weight to the judgment of the trial court. (*People v. Crossley* (1992), 236 Ill. App. 3d 207, 221.) A sentencing decision is a matter of judicial discretion, and, so long as the sentence is within the statutory limits, we hesitate to exercise our power to reduce it absent a finding that the trial court exceeded its discretion. (*People v. Loferski* (1992), 235 Ill. App. 3d 675, 690.) A sentencing judge is presumed to have considered all relevant factors, including any mitigation evidence, absent a contrary showing in the record. (*People v. Back* (1992), 239 Ill. App. 3d 44, 80; *People v. Smith* (1991), 214 Ill. App. 3d 327, 339.) A defendant's lack of any prior criminal history is not necessarily the most persuasive consideration at sentencing, and, in fact, the seriousness of the crime has been deemed the most important factor to be considered in imposing a sentence. *People v. Marsan* (1992), 238 Ill. App. 3d 470, 473.

In the instant case, defendant was found guilty of sexually assaulting his five-year-old stepdaughter, an extremely serious and de-

spicable crime. At the time of sentencing, defendant expressed no remorse but persisted in denying his involvement in the conduct of which B.Z. complained. In sentencing defendant the court specifically stated that it was basing its decision on all the statutory factors in aggravation and mitigation, the presentence report, the arguments of counsel, the victim's impact statement, the testimony at trial, and the defendant's statement.

In particular, the court considered that defendant had led a previously law-abiding life and had been working to support his family. However, the court also considered the nature of the crime involved and the harm done to the five-year-old complainant. The court carefully balanced these considerations and concluded that neither the minimum sentence of five years nor the maximum sentence of 30 years would be appropriate. Instead of imposing either of these penalties, the court sentenced defendant to 11 years' imprisonment, a sentence which was at the low end of the statutory range of sentencing for the offense in question. Given the seriousness of the offense and the nature and circumstances of the case, we cannot say that the trial court abused its discretion in imposing an 11-year sentence.

Based on the reasons given above, we affirm the judgment of the circuit court of Lake County.

Affirmed.

BOWMAN and DOYLE, JJ., concur.