THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY BAGGETT, Defendant-Appellant.

First District (4th Division)   No. 1—87—2444

Opinion filed June 29, 1989.

Michael Pelletier and Martin Carlson, both of State Appellate Defender's Office, and Cotton, Watt, Jones & King, both of Chicago (Irving M. King, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Andrea Muchin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant was convicted of aggravated criminal sexual assault, criminal sexual assault and aggravated criminal sexual abuse. The trial court ruled that the conviction of criminal sexual assault merged with the conviction of aggravated criminal sexual assault and sentenced defendant to concurrent terms of 15 years and 7 years for aggravated criminal sexual assault and abuse, respectively. On appeal, defendant contends that (1) the erroneous admission of prejudicial hearsay testimony concerning the details of a complaint made by the complaining witness constituted reversible error; and (2) he was denied a fair trial by the trial court's refusal to grant him a continuance to locate and present certain character witnesses.

At trial, Sherita Tigue (Sherita), the mother of the complainant (hereafter T.C.) testified that defendant is T.C.'s father and that between September 1984 and January 1985, defendant's mother, Mary Baggett, babysat T.C. and Sherita's younger son two or three weekends each month at her (Mrs. Baggett's) apartment in a senior citizens' apartment complex. Defendant did not live with his mother but visited her frequently. She stopped taking her children to Mrs. Baggett's home in January 1985 at the request of T.C., who gave as her reason for not wanting to go there that defendant was "not really a father to her." In May 1986, Sherita was contacted by Patrice Keleher (Keleher), a social worker at T.C.'s elementary school. Shortly thereafter, she spoke to T.C., who told her that defendant had been "fondling and petting her and had violated her by entering her with his penis." T.C. described additional details of what had occurred in subsequent conversations with Sherita.

On cross-examination Sherita stated that prior to May 1986, T.C. had said nothing to her regarding sexual abuse by defendant. She described T.C. as a very quiet and passive child and had not noticed anything unusual about her between late 1984 and early 1985.

At trial, T.C. testified that in the latter part of 1984, she and her younger brother spent almost every weekend at defendant's mother's apartment in a senior citizen residential complex. Defendant lived there "on an off-and-on basis." One evening near the day of her tenth birthday in September 1984, defendant came to the apartment after her grandmother and brother had gone to sleep in her grandmother's bedroom. She buzzed defendant in through the intercom system and then unlocked the apartment door for him to enter. They watched an

old cowboy movie on television for about an hour. He then arose from the couch where he had been sitting, came to where she was sitting on a cot and told her to rub him. She was wearing a nightgown and underwear; he was wearing a security guard's uniform. When defendant pulled down his pants, she asked him if "he would go to the bathroom," to which defendant responded by laughing. He then pulled down his underwear, took her hand, and put it on his penis. He also placed his hand under her nightgown, pulled down her underwear and began to "feel around [her] vagina" with his hand. She simultaneously hit at him and attempted, unsuccessfully, to pull up her underclothes. He then put his penis inside her vagina, which caused her pain. She tried to scream but he put his hand over her mouth. Defendant also placed his hands under her nightgown and touched her breasts. He removed his penis from her vagina after "about a minute" and told her that if she told anyone what had happened she "would be in big trouble." The same events occurred on four or five subsequent occasions at her grandmother's apartment. She did not mention the incidents to anyone, but in January 1985 she told her mother she did not want to go to her grandmother's apartment anymore because "he [defendant] wasn't being a father to [her]." She gave this explanation because she was afraid to tell her mother the truth.

In May 1986, T.C. saw a movie on television dealing with the sexual abuse of a girl by her uncle. In a conversation with her school friends Maya, Frances, Jean and Jenny about the movie, she told them that she knew someone who had been sexually abused. In a later conversation, Maya asked her if she was that person, to which she responded that she was. She thereafter spoke to the school social worker and her mother about what had happened and was also examined by a doctor.

On cross-examination, T.C. acknowledged that at a preliminary hearing she testified to seven or eight incidents of sexual contact with defendant. She stated that "the lady who was working with her" told her to add up how many times defendant "did it to [her] and the times he was rubbing on [her]"; but, in response to defense counsel's question, she stated that "it happened five or six times." She denied that she told the school social worker that there was only one incident, stating that she was merely describing one occasion that it happened. She stopped into the office of the school nurse at lunch two or three times a week to talk but never mentioned anything about any incidents of sexual abuse. She acknowledged that she told no one of these incidents between September 1984 and May 1986, when she told her friends. She met with Keleher for approximately 30 minutes

every Friday after their initial conversation in early May 1986 until the end of the school year. She stated that her mother and defendant did not get along and that her mother did not like defendant.

Maya Garcia testified that one afternoon in May 1986 she and her friends, T.C., Jennifer and Jean were talking at school about a movie shown on television about a girl who was molested by her uncle. When they asked T.C. whether she had been molested, she responded that she had a friend who had been molested. Maya and Jean then had a discussion in which they both expressed their suspicions that T.C. was referring to herself since she had not mentioned the name of the friend. They approached T.C. and asked if she had been the person who was molested and she said "yes," she had been molested by her father. The four girls then went to the school social worker's office and informed Keleher of what T.C. had reported.

Keleher testified that at about 2:30 p.m. on May 2, 1986, T.C., Maya, Jennifer and Jean came to her office. The girls informed her that they had something important to tell her and then proceeded to relate their conversation in art class in which T.C. told them she had been sexually abused. She asked T.C. whether she felt comfortable talking about the details, and asked who had abused her, how long ago and where it had taken place. T.C. told her that she had been abused by defendant in a senior citizen's home where her grandmother lived. She and T.C. had additional conversations about the abuse on May 9 and May 16. On May 20, Keleher contacted the Department of Children and Family Services (DCFS) and, the following day, made a formal report of what T.C. had told her in their conversations.

On cross-examination, Keleher identified a document consisting of notes she had taken about T.C.'s case in which she (Keleher) stated that T.C. "may have been sexually abused." In their conversation on May 2, T.C. mentioned only one incident of abuse. Keleher did not ask nor did T.C. tell her how many times such abuse had occurred. In their subsequent meetings, she encouraged T.C. to discuss the sexual abuse with her. T.C. never mentioned hitting her father or that he prevented her from screaming during the incident she described. She acknowledged waiting 18 days to notify DCFS, explaining that because she established that T.C. had had no contact with defendant for 1½ to 2 years, she considered T.C. to be in a safe situation; that because sexual abuse charges can be very threatening to a family and the child involved, it is necessary to compile sufficient information before filing a formal report; and that it is her policy in sexual abuse cases to give the child adequate time to feel comfortable discussing

the abuse with her before speaking to a stranger.

On redirect examination, the prosecutor asked Keleher if T.C. had told her that defendant touched her breasts, touched her vagina, had penetrated her by sexual intercourse, and that she experienced pain and had tried to push him away. Keleher responded in the affirmative to each question. On re–cross-examination, Keleher stated that T.C. had related these matters to her during their third meeting, on May 16, 1986.

Doctor Carl Turner testified that he performed both a general physical and pelvic examination of T.C. on August 2, 1986. T.C. was alert and cooperative with no signs of acute distress, physical injuries or abnormalities. T.C. was unable to cooperate in an internal, speculum examination, but from his visual and single-digit vaginal examination it appeared that T.C.'s hymen was separated, which was suggestive of some type of penetration.

On cross-examination Dr. Turner stated that although he was reasonably certain T.C.'s vagina had been penetrated, he could not determine in what manner penetration had occurred. He did not, however, believe that the separation was caused by an accidental injury because any such injury would have to have been substantial to separate the hymen, and there was no evidence of a healed injury as would normally be visible if one had occurred.

Detective Richard Curley testified that he was assigned to this case in late July 1986. He interviewed T.C. and her mother, two DCFS workers, T.C.'s friends Maya and Jean, the assistant school principal, Keleher and, subsequently, defendant's mother. His attempts to locate defendant were unsuccessful. On August 12, 1986, he contacted the State's Attorney's office after which a warrant was issued for defendant's arrest. Curley stated that the following day, approximately one hour after he spoke with defendant's mother, defendant came to the police station and surrendered himself.

Defendant testified that he worked as a maintenance man in a residential building and as a helper in his godmother's store and was involved in an employment dispute with a railroad for which he formerly worked. He was not employed during September 1984 and could not specifically remember his whereabouts on or about the weekend of September 26, 1984; but he surmised that he was at his girlfriend's home. Prior to T.C.'s birth, he and Sherita had been engaged to be married but at one point during the pregnancy she attacked him with a knife and cut him across his back and other areas of his body and that, as a result of her conduct, he terminated their relationship. Thereafter, the only contact between them consisted pri-

marily of demands by Sherita for money from him. T.C. did not know that he was her father until she was almost five years old. She and T.C. had a progressively good relationship from the time she was five years old until May 1984 when he lost his job and could no longer provide the weekly child support he had been paying to Sherita. He did not see T.C. after that time because he did not know where she and Sherita were living. His mother babysat for T.C. and her younger brother about one weekend each month and Sherita also went there to collect or borrow money. Defendant denied having any type of sexual contact with T.C. at any time.

Defendant further testified that he first learned that the police were looking for him when he arrived at his mother's house in the afternoon of August 13, 1986. He called the police station and was told to remain where he was and that someone would return his call. After waiting for approximately 15 minutes, he asked a friend to drive him to the police station where he spoke with Detective Curley.

On cross-examination, defendant stated that he kept a few clothes at his mother's apartment and, prior to May 1984, he occasionally stayed overnight there. His mother continued to babysit periodically for T.C. and her brother until November 1984, but he (defendant) did not stay at his mother's house or see T.C. after May 1984 when he lost his job and his car became inoperable. In response to the prosecutor's questions, defendant denied having ever touched T.C.'s vagina, put her hand on his penis, examined her vagina, fondled her breasts or slept in the same bed with her. He also denied telling Detective Curley that at one time he and T.C. had been laying in bed together at his mother's house when she began rubbing against him and told him that a "boy had laid on top of her, but nothing happened" and that he then pushed aside her underwear and examined her vagina to see if anything was wrong. Rather, he stated, he told Curley that at one time, possibly in 1982, he felt her underwear when she complained of being wet; and that on another occasion, when she spent the afternoon at his mother's apartment because of a school strike in October 1982, she rubbed her leg against him while laying next to him on the couch listening to him read her homework to her.

In rebuttal, Detective Curley testified that after informing of the allegations against him, defendant related an incident which occurred at his mother's house. According to Curley, defendant stated that he and T.C. were laying in bed together; that she rubbed against him; that when he asked her what she was doing, she told him a boy had lain on top of her; and that he thereupon pushed aside her underwear and examined her vagina. On cross-examination, Curley acknowledged

that both before and after describing this incident, defendant denied ever having any sexual relations with T.C.; and Curley did not recall whether his questions or defendant's responses regarding this incident were directed to the period between September 1984 and January 1985.

The trial was recessed until the following morning, at which time the trial judge advised defendant that he had reconsidered and decided to reverse his earlier ruling denying defendant's motion to present character witnesses on the ground that defendant's reputation for truth and veracity had not been placed in issue by the State and his reputation for honesty had no relation to the offenses charged. Defendant informed the court that on the basis of the court's ruling the day before, he had called those witnesses and cancelled their scheduled appearances, but that he would attempt to contact them and arrange for their appearance.

Following a morning recess, Reverend John W. Petty testified that he was the pastor of a Baptist church and had known defendant for 11 or 12 years. According to Reverend Petty, defendant had a reputation within the church congregation of being a truthful and honest person.

Following a lunch recess defense counsel informed the court that he had been unable to contact the three other witnesses he had intended to call and asked for a one-day continuance to make them available. The court denied the motion, but when defense counsel informed the court that a long-term acquaintance of defendant's was in another courtroom, the trial judge allowed counsel three minutes to bring her to court. That witness, Estella Sims, testified that she had known defendant for 15 or 16 years and that he had a reputation in the community as being a truthful and honest person.

Following closing arguments, the jury found defendant guilty of aggravated criminal sexual assault, criminal sexual assault and aggravated criminal sexual abuse. Defendant's motion for a new trial was denied and, after a hearing, the court ruled that the conviction of criminal sexual assault merged with that of aggravated criminal sexual assault and sentenced defendant to concurrent terms of 15 years for aggravated criminal sexual assault and seven years for aggravated criminal sexual abuse. This appeal followed.

OPINION

■ Defendant contends that the erroneous admission into evidence of the inadmissible hearsay testimony of three State witnesses concerning the details of T.C.'s report of sexual assault by him consti-

tuted reversible error. Defendant does not dispute that the legislature enacted a statutory exception to the hearsay rule in section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10) (the Code), providing:

"In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Section 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child that he or she complained of such act to another; and

(2) testimony by the person to whom the child complained that such complaint was made in order to corroborate the child's testimony."

Defendant argues, however, that the testimony of T.C.'s mother, her friend, Maya, and social worker Keleher greatly exceeded the scope of section 115—10 and that the prejudice resulting therefrom entitles him to a new trial.

■■ ■ As a general rule, the testimony of a witness cannot be bolstered by evidence that she made similar statements out of court. However, exceptions have been long recognized at common law in cases involving sexual offenses. Under the first exception, commonly known as the "prompt complaint," the complainant was allowed to testify that she made a prompt complaint of the incident. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) The rationale underlying the exception is that it is entirely natural that the victim of a forcible sexual assault would speak out regarding it and, conversely, that the failure to do so would, in effect, be evidence that the alleged incident had not occurred. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) While the exception imposes no fixed time limits within which the complaint should be made to qualify as "prompt," it does require that the complaint was made without any inconsistent or unexplained delay, and that it was voluntary and spontaneous rather than the product of a series of questions. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) Courts reasoned that since the sole purpose of the exception was to rebut any presumption which might arise from the complainant's silence, only the fact of the complaint was admissible; neither the details of the complaint nor testimony concerning the identity of the perpetrator named in the complaint were allowable. *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. Evans* (1988), 173 Ill. App. 3d 186, 527 N.E.2d 448.

■■ Similarly, common law recognized and applied an exception

known as the "corroborative complaint" exception to the hearsay rule in rape cases. The common law corroborative complaint exception allowed a person to whom a timely complaint of rape was made to testify to that fact. As under the "prompt complaint" exception, the corroborative complaint exception did not permit a recitation of the details of the rape complaint (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25). Moreover, it did not apply to cases of indecent liberties with children. See *People v. Romano* (1923), 306 Ill. 502, 138 N.E.2d 169; *People v. Hernandez* (1980), 88 Ill. App. 3d 698, 412 N.E.2d 572; *People v. Buckley* (1976), 43 Ill. App. 3d 53, 356 N.E.2d 1113.

In January 1983, the legislature enacted section 115—10 as a statutory exception to the hearsay rule applicable to cases charging indecent liberties against children. (Ill. Rev. Stat. 1983, ch. 38, par. 115—10.) Thereafter, the provisions encompassing the indecent liberties offense (Ill. Rev. Stat. 1961, ch. 38, par. 11—4), along with rape and other sexual offenses, were repealed and recodified as part of new sections 12—13 through 12—16 of the Code (Ill. Rev. Stat., 1984 Supp., ch. 38, pars. 12—13 through 12—16). The new sections comprise a comprehensive set of sex crimes characterized by bodily harm and include offenses against both children and adults. Section 115—10, as quoted above, was amended at approximately the same time to reflect its applicability to the new provisions.

As explained by the sponsor of the bill which was ultimately enacted as section 115—10.

> "It provides that, in a prosecution for a sexual act on a child *** the child may testify that he or she complained of such act, and the person who heard the complaint may testify that it was made, in order to corroborate the child's testimony. In other words, the person who corroborates [the complainant's] testimony does not talk about the act itself. All he talks about is the fact that the child, in fact, did make a complaint, and that would be *** corroboration of the child's testimony."

Consistent therewith, Illinois jurisprudence has held that section 115—10 limits corroborative complaint testimony to the fact that a complaint was made, and that it does not expand the prompt complaint exception so as to permit others apart from the complainant to testify as to the details of the incident about which she complained. (*People v. Laremont* (1988), 174 Ill. App. 3d 201, 528 N.E.2d 249; *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.) Although it has been recognized that, often, corroborative complaint testimony will necessarily include some detail in order to effectively

corroborate the fact of the complaint and to identify the incident as the one before the court (*People v. Powell* (1985), 138 Ill. App. 3d 150, 485 N.E.2d 560), courts have consistently held that the admission of testimony which contains unnecessarily excessive details of the complaint or which identifies the name of the alleged perpetrator is error. *People v. Cregar* (1988), 172 Ill. App. 3d 807, 526 N.E.2d 1376; *People v. Jackson* (1987), 165 Ill. App. 3d 665, 520 N.E.2d 640; *People v. Sexton* (1987), 162 Ill. App. 3d 607, 515 N.E.2d 1359; *People v. Johnson* (1986), 149 Ill. App. 3d 128, 500 N.E.2d 657; *People v. Salas* (1985), 138 Ill. App. 3d 48, 485 N.E.2d 596.

■ The admission of unnecessary or impermissible detail may be deemed harmless error when it is substantially corroborated by the testimony of the complainant who is present in court and available for cross-examination or by other competent evidence. (*E.g., People v. Laremont* (1988), 174 Ill. App. 3d 201, 528 N.E.2d 249; *People v. Jackson* (1987), 165 Ill. App. 3d 665, 680, 520 N.E.2d 640; *People v. Powell* (1985), 138 Ill. App. 3d 150, 485 N.E.2d 560.) However, in the absence of substantial corroborating evidence, a danger is created that the repetition of the complainant's version of the incident will prejudicially bolster the child's testimony (*People v. Laremont* (1988), 174 Ill. App. 3d 201, 528 N.E.2d 249) and that a guilty verdict may be the result of the jury hearing the child's version of the alleged incident more than once (*People v. Johnson* (1986), 149 Ill. App. 3d 128, 500 N.E.2d 657; see also *People v. Andino* (1981), 99 Ill. App. 3d 952, 425 N.E.2d 1333; *People v. Evans* (1988), 173 Ill. App. 3d 186, 527 N.E.2d 448).

Here, in addition to T.C., the State presented three witnesses whose testimony was being offered, according to the prosecutor in his opening statement, to corroborate that T.C. had complained of sexual abuse. However, each of the witnesses testified not only to the fact of the complaint but also to the substance of it. As noted earlier, Maya Garcia testified that T.C. told her and two other classmates that she had been molested by defendant. Sherita Tigue testified that after being contacted by Keleher, she spoke with T.C., and then described the various acts of sexual molestation and intercourse recounted to her by T.C. and testified that T.C. had related "more of the details of what had occurred" in subsequent conversations. Patrice Keleher testified that over the course of several conversations T.C. told her that defendant had touched her breasts and vagina, that he had sexual intercourse with her, that the penetration was painful and that she had resisted him. The inclusion of explicit details of the conduct constituting the offense and the repeated identification of defendant went well

beyond what was necessary to corroborate that a complaint was made and clearly exceeded the bounds of the corroborative complaint exception embodied in section 115—10.

Moreover, we are unable to conclude that the inadmissible evidence was so substantially corroborated by other evidence as to render the error in its admission harmless beyond a reasonable doubt. Omitting the inadmissible portions, the testimony of Sherita, Maya and Keleher established that T.C. did not complain to anyone of sexual abuse until May 2, 1986, approximately 1½ years after its alleged occurrence and then only in response to direct questions by her friends, following a movie they had recently viewed dealing with the sexual abuse of a young girl by a male relative, as to whether she had ever been sexually abused. When first questioned by her classmates, T.C. states that a friend of hers had been molested, and it was only after further inquiries by her friends that she later stated that it was she who had been abused. The three girls then accompanied her to Keleher's office and reported that T.C. had been sexually abused. Keleher acknowledged that in their first conversation on May 2, as well as in subsequent meetings, she asked T.C. numerous questions concerning when and where the abuse had occurred and the identity of the offender and that she had encouraged T.C. to recount the details of the acts perpetrated upon her. Keleher also acknowledged that T.C. mentioned only one incident of sexual abuse on May 2 and that it was not until their discussion on May 16 that T.C. described the alleged acts which constituted sexual assault and abuse. According to T.C.'s mother, Sherita, she first learned of the alleged abuse from Keleher and thereafter discussed the subject with T.C. Sherita also testified that in January 1985, when she asked T.C. the reason for her request that she no longer spend weekends at her grandmother's apartment, T.C. stated only that defendant "was not really a father to [her]"; and that she noticed nothing unusual about T.C. at that time.

■■ Although a lack of promptness or spontaneity in the making of a complaint does not render corroborative complaint testimony inadmissible, they are factors which affect the credibility of the complainant and the weight to be given the evidence. (*People v. Goebel* (1987), 161 Ill. App. 3d 113, 514 N.E.2d 60.) The case at bar, as in most cases of sexual assault, turned largely on the credibility of the complainant and the defendant, respectively. Defendant unequivocally denied committing the offenses. Given the conflicts in the testimony of T.C. and defendant in this case, the issue of credibility was of vital importance (*People v. Sexton* (1987), 162 Ill. App. 3d 607, 515 N.E.2d 1359; *People v. Johnson* (1986), 149 Ill. App. 3d 128, 500 N.E.2d 657).

We are unable to gauge the extent to which the jury was influenced by the erroneous admission of the testimony detailing the acts described by T.C. in her conversations with her friends, her mother and the school social worker. However, we do not find T.C.'s testimony so clear and convincing as to the numerous incidents of sexual assault which allegedly occurred in the home of her grandmother while her grandmother and brother were in another room, or her explanation for her failure to report them until approximately 1½ years later and then only in response to questioning, so as to be able to conclude that the inadmissible corroborative complaint testimony did not have the effect of improperly bolstering T.C.'s testimony in the minds of the jurors.

We are mindful of, but not persuaded otherwise by, the testimony of the physician who examined T.C. Although he opined that the separation of her hymen was likely the result of penetration, we note that the examination was performed nearly two years after the incident which purportedly caused the separation; that the doctor, based on his limited examination of T.C. acknowledged that it could not be determined when or in what manner penetration had occurred.

■ In summary, we conclude that the testimony concerning T.C.'s report of sexual assault and abuse erroneously exceeded the bounds of the corroborative complaint exception of section 115—10 and that because the testimony lacked sufficient evidentiary corroboration, its admission created a strong possibility of prejudice to defendant and cannot be said to have been harmless error beyond a reasonable doubt.

In view of our decision that this cause must be reversed and remanded for a new trial, we need not address defendant's contention that the trial court erred in denying his motion for a continuance to contact and reschedule the appearances of reputation witnesses after the court's reversal of its prior ruling that their testimony would not be allowed.

For the reasons stated, defendant's convictions for aggravated criminal sexual assault and aggravated sexual abuse are reversed and this cause is remanded for a new trial.

Reversed and remanded.

LINN and JOHNSON, JJ., concur.