# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Oats, 2013 IL App (5th) 110556**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD OATS, SR., Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-11-0556 |
| Filed | August 6, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's life sentence for the predatory criminal sexual assault of his former girlfriend's children was upheld, since the prerequisites of section 115-10 of the Code of Criminal Procedure for the admission of the hearsay statements of the children were satisfied, the representation provided by defendant's counsel was not deficient, his guilt was established beyond a reasonable doubt, and his sentence neither violated the proportionality clause nor was cruel or unusual in view of the circumstances. |
| Decision Under Review | Appeal from the Circuit Court of Jefferson County, No. 03-CF-100; the Hon. Terry H. Gamber, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Gilbert C. Sison, of Rosenblum, Schwartz, Rogers & Glass, P.C., of St. Louis, Missouri, for appellant.

Douglas R. Hoffman, State's Attorney, of Mt. Vernon (Patrick Delfino, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.

Presiding Justice Spomer and Justice Chapman concurred in the judgment and opinion.

**OPINION**

¶ 1      Defendant, Edward Oats, Sr., was charged by information with six counts of predatory criminal sexual assault of his ex-girlfriend's three children. After a trial in the circuit court of Jefferson County, the jury returned a verdict of guilty on three of the counts and acquittal on the remaining three counts. Defendant was sentenced to a term of natural life imprisonment. On appeal, defendant raises issues as to: (1) whether the circuit court properly admitted hearsay statements with safeguards of reliability (725 ILCS 5/115-10 (West 2008)), (2) whether he was proven guilty beyond a reasonable doubt, (3) whether he received effective assistance of counsel, (4) whether his sentence violated the proportionality clause of the Illinois Constitution, and (5) whether his sentence was cruel and unusual in violation of the eighth amendment of the Constitution of the United States. We affirm.

¶ 2                           FACTS

¶ 3      Sometime after the lunch period on March 7, 2003, Camille Jones, a substitute teacher, was approached by a third-grade student, Tyeshia K. According to Jones, Tyeshia appeared nervous and asked to speak privately out in the hallway. Tyeshia stated: "[M]y momma's boyfriend has been having sex with me, and he came last night. He's coming back tonight, and I'm sick of it." Jones stated that she wanted to be "careful" in her response, so she escorted Tyeshia into a room and gave her four sheets of paper with no other instruction than to write down the date, address a letter to "Dear Miss Jones," and "pour your heart out."

¶ 4      After Tyeshia was finished writing, Jones escorted her to the administrative office and gave the letter to assistant principal Ed Brashear and principal Linda Hanson, who then notified the school social worker, Patricia Spicuzza. Spicuzza testified she stopped her interview and called the Department of Children and Family Services (DCFS) hotline upon

Tyeshia telling of being sexually touched by defendant. At the recommendation of the DCFS, the police were notified. Tyeshia's siblings, Tashirah D., in sixth grade, and Travis D., in fifth grade, were held separately at school until police arrived and transported them individually to the Amy Center, a child advocacy center.

¶ 5 At the Amy Center the minors were held in separate rooms where they could not communicate with each other and interviewed individually. The interviews were conducted by Detective McElroy with Vanessa Shaw of the DCFS present in the room. In an adjacent room, Detective Gilbert observed the interviews through a closed-circuit television system designed for such interviews. Detective Gilbert took notes to form police reports.

¶ 6 After the interviews, Detectives Gilbert and McElroy, with the permission of the mother, searched the home. Gilbert testified that the bedroom where the offenses allegedly took place was laid out as described by Tyeshia, including the location of a jar of Vaseline on a dresser.

¶ 7 Later the officers discovered that the recordings of the interviews did not have audio, apparently due to failure to align the switches for the closed-circuit video. On March 11, 2003, four days after the initial interviews, a second set of interviews was conducted at the Amy Center. The minors stayed in the custody of their mother in the interim.

¶ 8 On March 14, 2003, Deanna St. Germain, D.O., examined the minors at Union County Hospital. Upon cross-examination, St. Germain admitted that there was no conclusive physical evidence of abuse for any of the minors. St. Germain conceded that any of her opinions that examination was consistent with abuse were based on the history given by each minor.

¶ 9 The State filed notice that it intended to use hearsay statements pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2008)). The court held hearings over the course of several days, which included testimony from Ken McElroy, Camille Jones, Vanessa Shaw, Patricia Spicuzza, and Linda Hanson. Shaw stated that the only significant difference between the substance of the first and second interviews was that Tyeshia described defendant as having blue boxer shorts in the first interview and red in the second. Shaw believed that the minors were otherwise consistent in their statements and demeanor. Shaw testified that besides the two interviews she did not speak with any of the children regarding the incident at any other time.

¶ 10 Detective McElroy testified that his training for interviewing minors had instructed him to ask open-ended questions and go where the child takes him. McElroy stated that he had no discussions with the minors regarding the allegations between the interviews. He testified that "pretty much everything was the same" for the first and second set of interviews and that any differences were "very minute."

¶ 11 At the conclusion of the hearing, the court found the hearsay statements of the minors reliable. The court stated:

"The [c]ourt will grant the State's request for notice pursuant to 725 ILCS 115-10 to allow hearsay statements made by the three minors, T.K., T.D. and T.D., and the [c]ourt finds the time, content and circumstances of those statements all provide sufficient safeguards of reliability. The [c]ourt heard lengthy testimony. And this occurred at school, and the substitute teacher, Ms. Jones, immediately took the children to the office.

Ms. Hanson, Mr. Brashear were involved. Ms. Spicuzza was involved. The [c]ourt finds certainly that sufficient safeguards of reliability were met. This occurred immediately after Ms. Jones was made aware of the statements. So the [c]ourt will grant the State's request and will allow hearsay. Further, the State has stated that the children will be available and will testify."

¶ 12    At trial, each minor testified. Tyeshia testified defendant had made sexual contact with her:

"Q. [Attorney for State:] *** Can you tell us the types of things that would happen to you?

A. He would always rub his penis between my legs, and I would tell him that it hurted, and then he would make me suck his penis. Then he would put Vaseline between my legs and he would put Vaseline on his penis.

Q. Okay. And when you say he would rub his penis between your legs–

A. On my vagina.

Q. On your vagina. I don't want to be too graphic, but was his penis–was it inside your vagina?

A. No, but he would always try to put it in there, and I say, no, it hurt.

Q. So he would try to put it in–would put it in and it hurt, and would he stop?

A. Yes.

Q. Okay. And you said that he put his penis in your mouth?

A. Yes."

In particular, Tyeshia recounted defendant having contact with her and Tashirah on some bunk beds just after they were installed. Tyeshia described the defendant having "me suck his penis" and that "he would rub my butt crack, but he would never put it in there."

¶ 13    Tyeshia testified that defendant made sexual contact with her sister, Tashirah, but on fewer occasions. Tyeshia related that through an open door into their mother's bedroom, she saw defendant play with Tashirah's breasts, and she testified: "[Defendant] would always like–they'd go in my mom's room. [Defendant] would lay her on the bed, and he would fondle with her, like put his penis between her legs and touch her."

¶ 14    Tashirah D. testified that defendant had made sexual contact with her. Tashirah D. related that it first started happening after the family moved into a house in Mt. Vernon:

"A. [Defendant] would bring us in there (the mother's bedroom)–well, bring me in there and, of course, had the door closed or whatever. He had his little Vaseline, and he would take his penis, he would put it in my mouth.

Q. [Attorney for State:] It's okay.

A. He would put it in our mouth, and then once he–he did–he tried to insert it in, but it hurted so that didn't happen.

Q. And I'm sorry. I'm going to kind of stop you here. You say put it–'insert it in'?

A. Uh-huh.

-4-

Q. Insert it in where?

A. Into my vagina.

Q. Okay. You said it hurt?

A. Uh-huh.

Q. Is that correct? So not to be too graphic, but his–his penis went inside–went in your vagina?

A. Uh-huh.

Q. But it–it hurt?

A. Uh-huh.

Q. Did he–did he stop?

A. Yes.

Q. Did you tell him–how did this happen? How did he stop? At what point did he stop? Do you know?

A. When I told him it hurt. I didn't scream loud, but I kind of screamed a little bit.

Q. But it did go in your vagina at that time?

A. Yes.

Q. Okay. Did he place his penis anywhere else?

A. Not that I can remember.

Q. Okay. How often would this happen?

A. Like twice a week for me anyways.

Q. Okay. Did it happen more or less to Travis and Tyeshia?

A. It happened more to Tyeshia, less to me and my brother."

¶ 15    Travis testified that defendant made him perform oral sex on him. Travis stated, "[Defendant] tried to put it in my butt, but it wouldn't fit." Travis testified that he saw defendant make Tyeshia have oral sex with defendant in their mother's bedroom. Travis also testified that defendant had made Tashirah perform oral sex and placed his penis in her vagina while in their mother's bedroom. Afterwards, defendant would take them to Walmart or out for ice cream.

¶ 16    At trial, defendant testified in his own defense and denied any alleged sexual conduct. Defendant testified that he never had a standing commitment to babysit the minors, though he would watch them on occasion when no other option was available. Defendant testified that he picked up the minors on only three occasions. Moreover, his relationship with the minors' mother ended in 2002, and the last time he was at the house was approximately two to three weeks before the alleged abuse was reported. Defendant first found out about the allegations when he was arrested. Defendant described and displayed birthmarks to the jury.

¶ 17    The jury returned a verdict finding defendant guilty of three of the six counts. Defendant was found guilty of both counts of predatory criminal sexual assault of Tyeshia K. The jury found defendant guilty of the charge based on vaginal penetration of Tashirah D., but acquitted him on the charge based on anal penetration of Tashirah D. Defendant was

acquitted on the counts based on oral and anal penetration of Travis D. The circuit court entered judgment on the verdict and sentenced defendant to a term of natural life imprisonment. Defendant appeals.

¶ 18                                                           ANALYSIS

¶ 19                                                                I.

¶ 20                                                        SECTION 115-10

¶ 21      Defendant contends that the trial court erred by admitting hearsay of the minors' statements. The Code of Criminal Procedure of 1963 allows for admission of hearsay statements of sexual acts perpetrated on a minor under the age of 13 under certain circumstances. 725 ILCS 5/115-10(a), (b)(3) (West 2008). In order to apply the exception, the court must find in a hearing conducted outside the presence of the jury that "the time, content, and circumstances of the statement provide sufficient safeguards of reliability." 725 ILCS 5/115-10(b)(1) (West 2008). The State has the burden of proving that the prerequisites of section 115-10 are met and that the statements were not the result of prompting or manipulation. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 96, 981 N.E.2d 1025.

¶ 22      Defendant contends that the statements were unreliable. Defendant points to statements of several witnesses, including school personnel and responding law enforcement, Tyeshia's letter written at the instruction of Jones, and both the first and second interviews of each of the minors at the Amy Center. Both of the interviews, the one with audio and the one without, were played to the jury. At the heart of the concern is the lack of an audio recording of the first interview.

¶ 23      Defendant argues that the failure to properly record the first interview resulted in a lack of adequate safeguards. Defendant concedes that the omission of audio was inadvertent, but argues that the lack of audio recording creates doubt as to whether the minors were influenced by suggestion. Defendant points out that there is no record of the precise questions and answers of the initial interview.

¶ 24      The lack of an audio recording of the initial interview leads this court to review with great scrutiny the determination to admit the statements. As our Illinois Supreme Court has recognized, the recording of interviews of minors claiming sexual abuse is "important because children, especially younger children, are 'particularly susceptible' to suggestion by adults." *People v. Miles*, 351 Ill. App. 3d 857, 866, 815 N.E.2d 37, 45 (2004) (quoting *People v. Zwart*, 151 Ill. 2d 37, 45, 600 N.E.2d 1169, 1172 (1992)). The State has the burden of proving the reliability of the statements. *Garcia*, 2012 IL App (1st) 103590, ¶ 96, 981 N.E.2d 1025. Relying on this burden, defendant points to the Illinois Supreme Court's decree that a "trial court should not presume from a silent record that suggestive interview techniques were not used." *Zwart*, 151 Ill. 2d at 45, 600 N.E.2d at 1172. The record, however, is far from silent.

¶ 25      The determination of reliability by a trial court at a section 115-10 hearing requires an evaluation of the totality of the circumstances. *Garcia*, 2012 IL App (1st) 103590, ¶ 95, 981 N.E.2d 1025. In evaluating whether the time, content, and circumstances of a statement provide sufficient safeguards of reliability, courts have looked to several factors, including

"(1) the spontaneity and consistent repetition of the statement; (2) the mental state of the child in giving the statement; (3) the use of terminology not expected in a child of comparable age; and (4) the lack of a motive to fabricate." *People v. Bowen*, 183 Ill. 2d 103, 120, 699 N.E.2d 577, 586 (1998).

¶ 26    Defendant points to *People v. Miles*, where the custodial interview of a minor was not recorded. *People v. Miles*, 351 Ill. App. 3d 857, 866, 815 N.E.2d 37, 45 (2004). *Miles* began by noting that when a minor's account of abuse is not recorded verbatim, his statement will be viewed with "skepticism" because of susceptibility to adult prompting or manipulation. *Miles*, 351 Ill. App. 3d at 866, 815 N.E.2d at 45 (citing *People v. Simpkins*, 297 Ill. App. 3d 668, 677, 697 N.E.2d 302, 308 (1998)). As such, when the State fails to record such interviews it runs the risk of having statements of the minor held inadmissible. In *Miles*, the State "chose not to record" the minor's interview. *Miles*, 351 Ill. App. 3d at 866, 815 N.E.2d at 45.

¶ 27    In reversing the trial court's finding of reliability, *Miles* looked to the totality of the circumstances. *Miles* noted that at the section 115-10 hearing the minor's mother testified that the hospital's social worker talked to the minor on the evening she reported the abuse, but no statements made to the social worker were presented for admission at the section 115-10 hearing. At trial, the hospital's social worker could not even recall speaking with the minor. As such, there was no record whatsoever of the questions or answers of that interview. The *Miles* court commented that "[w]ithout any evidence of the substance of a previous interview, courts normally consider the circumstances of the subsequent interview to be unreliable." *Miles*, 351 Ill. App. 3d at 866, 815 N.E.2d at 45; *Zwart*, 151 Ill. 2d at 44, 600 N.E.2d at 1172.

¶ 28    After conducting a section 115-10 hearing, the trial court in *Miles* had found statements by the mother and an interviewing detective were reliable. *Miles* found that the time, content, and circumstances of the hearsay relayed by the mother and the detective failed to display safeguards of reliability. Pointing to the specifics of the mother's testimony, *Miles* found evidence of prompting. *Miles*, 351 Ill. App. 3d at 867, 815 N.E.2d at 45. In addition, the mother was unable to consistently describe circumstances of the statements made by the minor. Furthermore, the detective could not recall many of the questions that she had asked the minor, and those questions that the detective had written down were troubling in their leading nature and focus on the defendant.

¶ 29    In contrast to *Miles*, the time, content, and circumstances here display safeguards of reliability. Unlike *Miles*, at the section 115-10 hearing the State presented a detailed progression of how the minors were handled in a manner to protect against suggestion, from Tyeshia's contacting a teacher at school, to the school administrators overseeing the contact of law enforcement, to the transport and interviews of each minor individually at the Amy Center. In *Miles*, the testimony of the interviewing detective and the mother indicates that both used prompting, leading questions. In contrast, defendant's arguments do not derive from any indication of prompting or suggestion in the second interviews at the Amy Center. Instead, the concerns stem from the lack of an audio recording of the initial interview.

¶ 30    Unlike *Miles*, the interviewing detective and the DCFS worker both testified at the

section 115-10 hearing that for each minor the second interview was substantially the same as the first. Defendant's claim that better evidence of the original interviews should have been presented, along with more detailed inquiry into the questions asked at the first set of interviews, does not undermine the safeguards. In contrast to the interviews by the social worker and the detective in *Miles*, the court was presented with a record of the substance of the original interviews that indicated that sufficient safeguards had been followed and that the statements of the minors were not the product of suggestion. We stand by *Miles*'s prudent recommendation to record interviews of minors. Whenever the State fails to follow this recommendation, the burden it faces in proving the statements to be reliable is certainly made more difficult, and such statements are bound to be met with, in the words of *Miles*, more skepticism. In the end, the question presented by the lack of a proper recording of the first interview is not a matter of intent of the State, but of the reliability of the statements of the minors. The mere inadvertence to properly record the first interview does not excuse the State from the burden of proving the statements to be reliable.

¶ 31                                    II.

¶ 32              EFFECTIVE ASSISTANCE OF COUNSEL

¶ 33       Paradoxically, in arguing that the statements of the minors should not have been admitted under section 115-10, defendant claims that he was prejudiced because the admission of the interviews of the minors resulted in an unnecessary repetition of the allegations against him. See *People v. Baggett*, 185 Ill. App. 3d 1007, 1016, 541 N.E.2d 1266, 1272 (1989); *People v. Anderson*, 225 Ill. App. 3d 636, 647, 587 N.E.2d 1050, 1059 (1992). Given defendant's assertion on appeal that the interviews were inconsistent with their trial testimony, the strategy of trial counsel to let the two sets of interviews be compared by the jury seems not only sound, but a most persuasive strategy to represent defendant.

¶ 34       Defendant contends that his trial counsel was ineffective, having committed several errors. The focus of defendant's contention is alleged failures in examination of the minors. The first among these was not confronting the minors with evidence of defendant's birthmarks. Defendant relies on an ostensible admission by trial counsel that she could not recall whether she asked the minors about the birthmarks during cross-examination and that if she did not, she "probably should have asked." Nonetheless, defendant's reliance on this ostensible admission fails to account for trial counsel's explanation that, regardless of cross-examination, she effectively utilized the failure of the minors to mention the birthmarks during the police interviews. As a matter of persuasive representation, trial counsel attacked the minors' credibility for failure to identify the birthmarks in closing argument. Indeed, the strategy of not asking the minors about whether defendant had birthmarks, or even the appearance of defendant's body, was sound. Among the potential drawbacks of the approach advocated by defendant on appeal, cross-examining the minors on the matter would have run the risk of undermining the argument by giving the minors an opportunity to explain away their omission during the police interviews.

¶ 35       Similarly, defendant contends that trial counsel failed to use the prior videotaped interviews for impeachment during cross-examination of the minors. On appeal, defendant

contends that a simple comparison between trial testimony and the interviews reveals a number of inconsistencies that were not explored. Although defendant does not list the inconsistencies, his trial counsel argued that the courtroom testimony was inconsistent with the videotaped interviews in closing argument. The merits of cross-examining the minors regarding any discrepancy are, at best, questionable. Moreover, the approach defendant advocates on appeal would have given the minors a chance to explain away the inconsistencies. See, *e.g.*, *In re Commitment of Dodge*, 2013 IL App (1st) 113603, ¶ 10, 989 N.E.2d 1159. Trial counsel's handling of the cross-examinations was a matter of trial strategy and well within the range of professional assistance. *People v. Pecoraro*, 175 Ill. 2d 294, 326, 677 N.E.2d 875, 891 (1997).

¶ 36    Defendant alleges several other errors by his trial counsel. For instance, defendant contends that his trial counsel failed to examine Detective McElroy regarding statements the detective allegedly made of a threatening nature to defendant's girlfriend, but defendant fails to show the relevance of the statements or how he was prejudiced by the lack of such an inquiry. Defendant also contends that trial counsel was unprepared and failed to investigate the case. Specifically, defendant contends that trial counsel failed to interview Mary and Paul Bolling. Although defendant admits that the Bollings were apparently uncooperative, he asserts that they "were present with the children around the time these allegations were made." Defendant's allegations show neither a lack of diligence in investigation nor a failure to present a possible alibi. See, *e.g.*, *People v. Guest*, 166 Ill. 2d 381, 402, 655 N.E.2d 873, 883 (1995).

¶ 37    In order to support a claim for ineffective assistance of counsel, a defendant must show that his counsel was ineffective and that the conduct of his counsel was deficient and that he was prejudiced by this conduct. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255 (1984). Defendant fails to establish that the representation by his trial counsel was in error or deficient. Indeed, the record reflects defendant was afforded professional representation.

¶ 38                                          III.

¶ 39                      SUFFICIENCY OF THE EVIDENCE

¶ 40    Defendant contends that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Defendant points out the lack of physical evidence of penetration, a point well established by his trial counsel in cross-examining Dr. St. Germain. As Dr. St. Germain testified, however, there was a delay of a few days between the alleged abuse and the examinations. Defendant also points to the absence of forensic evidence, but, as the State aptly asserts, this was not a case where forensic evidence was likely to be found. Instead, as the State admits, this case rested upon the testimony of the minors.

¶ 41    Defendant raises contentions that go to the weight and credibility of the testimony of the minors, but do not undermine the sufficiency of the evidence against him. He contends that the testimony of the minors at trial differed from that of the original interviews, but this was a matter of credibility. Defendant also contends that Tyeshia and Tashirah failed to establish exactly when these acts took place. Tashirah testified, however, that the abuse began shortly

after the family moved to Mt. Vernon, and Tyeshia described the abuse as taking place there. Defendant was not misled in his defense, nor was his defense otherwise materially affected by the timing described in the State's case. See *People v. Thrasher*, 383 Ill. App. 3d 363, 368, 890 N.E.2d 715, 720 (2008).

¶ 42       Several of the arguments raised by defendant on appeal go to specific counts. For instance, defendant asserts that Tyeshia herself unequivocally testified that there was no vaginal penetration. The totality of Tyeshia's testimony, however, supports a finding of vaginal penetration. Tyeshia testified that defendant would put Vaseline between her legs and "on" her vagina. Upon further questioning, Tyeshia stated that defendant would not rub his penis "inside" her vagina. Nonetheless, Tyeshia testified that defendant "would always try to put it in there." Tyeshia's description could readily be seen as an abatement or withdrawal after her complaint that "it hurt" upon penetration.

¶ 43       Similarly, defendant asserts that Tashirah's testimony regarding vaginal penetration was equivocal. Like Tyeshia, Tashirah testified that defendant stopped further penetration when she "told him it hurt."

¶ 44       The testimony of both victims was sufficient to support a finding of vaginal penetration. First, Illinois has long recognized that any intrusion, however slight, constitutes penetration. *People v. Franzen*, 251 Ill. App. 3d 813, 823, 622 N.E.2d 877, 886 (1993). Thus, when the victims testified that defendant rubbed his penis "on" their vaginal region for a prolonged period of time, penetration occurred. See *People v. W.T.*, 255 Ill. App. 3d 335, 347, 626 N.E.2d 747, 755 (1994) (head of penis on labia constituted penetration). Furthermore, both Tyeshia and Tashirah testified that defendant had further penetrated into their vaginal organs, but stopped when they told him the insertion hurt. Thus, if the testimony of Tyeshia and Tashirah is not parsed as advocated by defendant, a deeper penetration occurred–albeit for a shorter duration.

¶ 45                                          IV.

¶ 46                         CONSTITUTIONAL ISSUES

¶ 47       Defendant was sentenced to a term of life imprisonment pursuant to the Criminal Code of 1961 (Code) (720 ILCS 5/12-14.1(b)(1.2) (West 2008) (renumbered 720 ILCS 5/11-1.40(b)(1.2) (eff. July 1, 2011))), which provides:

> "A person convicted of predatory criminal sexual assault of a child committed against 2 or more persons regardless of whether the offenses occurred as the result of the same act or of several related or unrelated acts shall be sentenced to a term of natural life imprisonment."

Defendant contends that his sentence of life imprisonment violates both the Constitution of the United States and that of the State of Illinois.

¶ 48       The Illinois Constitution requires penalties to be proportionate to the crime. Article I of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 49   The question of whether the Code comports with the proportionate penalties clause of the Illinois Constitution has already been answered. *People v. Huddleston*, 212 Ill. 2d 107, 130, 816 N.E.2d 322, 335 (2004). In *Huddleston*, the defendant was convicted of three counts of predatory criminal sexual assault, but the trial court found that the mandate of a life sentence was unconstitutional as applied. In reversing the trial court, *Huddleston* found that the legislature's prescription of a mandatory life sentence for predatory criminal sexual assault passed the tests for proportionality. *Huddleston*, 212 Ill. 2d at 130, 816 N.E.2d at 335. In detail, *Huddleston* described how a mandatory life sentence for multiple criminal sexual abuse of a child passed the first test of proportionality of not being cruel, degrading, or so wholly disproportionate to the offense so as to shock the moral sense of the community. In short, *Huddleston* concluded that a mandatory life sentence was in line with the moral sense of the community and served the legitimate purposes of "ensuring that those who commit sexual acts with multiple victims will not have the opportunity to reoffend." *Huddleston*, 212 Ill. 2d at 134, 816 N.E.2d at 338.

¶ 50   *Huddleston* turned to the enactments of other legislatures as proof of the proportionality of the response of Illinois. In particular, *Huddleston* noted that "[w]hile several state statutes *authorize* a life sentence–with or without parole–for a perpetrator's *first* sexual assault of a child, at least five states, including Illinois, would *require* a sentence of mandatory life imprisonment, under certain circumstances." (Emphases in original.) *Huddleston*, 212 Ill. 2d at 140, 816 N.E.2d at 341 (citing Ohio Rev. Code Ann. § 2907.02(B) (LexisNexis 2003); La. Rev. Stat. Ann. § 14:42 (West Supp. 2004); *Adaway v. State*, 864 So. 2d 36, 37-38 (Fla. Dist. Ct. App. 2003) (Fla. Stat. §§ 794.011(2), 775.082(1) (1999)); *State v. Higginbottom*, 324 S.E.2d 834, 837 (N.C. 1985)); see *State v. Green*, 502 S.E.2d 819, 828 (N.C. 1998) (noting that statute in *Higginbottom* had been superceded but finding that mandatory life sentence for 13-year-old for commission of first-degree sexual offense is not cruel or unusual).

¶ 51   Defendant attempts to distinguish *Huddleston* from the Code as applied to him. Defendant's arguments misconstrue *Huddleston*. The discussion of a prior sexual offense and possession of pornographic materials in *Huddleston* was in the context of a broader discussion of the propensity of sex offenders to repeat. Moreover, *Huddleston* pointed to this activity to express incredulity regarding the defendant's expert, whose recommendation it found perverted the purpose of risk assessment. In the end, *Huddleston* found that the mandatory life sentence was justified for the multiple sexual abuses of the "latter two victims" for his current prosecution. *Huddleston*, 212 Ill. 2d at 142, 816 N.E.2d at 342. Similarly, defendant in the case at hand was convicted of sexually abusing two children. See *People v. Hernandez*, 382 Ill. App. 3d 726, 728, 888 N.E.2d 1200, 1203 (2008) (life sentence for sex offender was proportionate when only two victims). Nothing in the case at hand undermines the observation of *Huddleston* that mandating a life sentence for the crimes committed by defendant was the legislature's measured response to the "propensity of sex offenders to repeat." *Huddleston*, 212 Ill. 2d at 138, 816 N.E.2d at 340; see *People v. Ross*, 395 Ill. App. 3d 660, 683, 917 N.E.2d 1111, 1132 (2009).

¶ 52   Defendant also contends that, unlike *Huddleston*, there is scant evidence that the victims suffered from injuries. Again, the critical facts of *Huddleston* are not distinct. As in *Huddleston*, the testimony of the children displayed that they were well aware that they had

been violated. Similarly, this court fails "to see how their prognosis is any better than other sexual assault victims." *Huddleston*, 212 Ill. 2d at 144, 816 N.E.2d at 343.

¶ 53 Defendant also contends that a mandatory life sentence does not comport with the Constitution of the United States. The eighth amendment of the Constitution of the United States provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII; see *Graham v. Florida*, 560 U.S. 48, ___, 130 S. Ct. 2011, 2021 (2010).

¶ 54 Defendant points to the framework for categorical analysis of life sentences provided by *Graham*. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2021. In *Graham*, a mandatory life sentence without parole imposed on a juvenile nonhomicide offender was invalidated as categorically disproportionate. *Graham* set forth the following framework:

"The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. [Citation.] Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' [citation], the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution. [Citation.]" *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022.

¶ 55 The categorical analysis of the proportionality of a life sentence in *Graham* was centered on the defendant's status as a minor. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2032. Although *Graham* provides a framework for analyzing the proportionality of a sentence, its holding does not extend to life sentences imposed on adults. The disproportionality of the life sentence was focused on the defendant's status as a juvenile. *Graham* found the sentence would incarcerate a juvenile, with no hope for parole, before he had been given a chance to mature. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2032.

¶ 56 Even before *Graham*, Illinois recognized that mandatory life sentences for juveniles could be disproportionate. *People v. Miller*, 202 Ill. 2d 328, 341, 781 N.E.2d 300, 308 (2002). After *Graham*, Illinois has found that mandatory life sentences for adults do not raise the same concerns as such sentences for juveniles. See *People v. Brown*, 2012 IL App (1st) 091940, ¶ 71, 967 N.E.2d 1004 (finding imposition of mandatory life sentence on mentally impaired adult was proportionate).

¶ 57 In addition to those jurisdictions referred to in *Huddleston*, the State points to multiple states that permit life sentences for a first conviction of a sex offense. Ala. Code § 13A-6-61 (2012); Idaho Code Ann. § 18-1508 (West 2012); Md. Code Ann., Crim. Law § 3-303 (West 2012); Mo. Ann. Stat. § 566.030 (West 2012); Mont. Code Ann. § 45-5-502 (2012); Utah Code Ann. § 76-5-404.1 (West 2012). Defendant points out that, compared to Illinois, these jurisdictions leave the severity of the sentence to the discretion of the court. Nonetheless, these statutory schemes cover an array of sex offenses and indicate that a life term is appropriate in cases of sexual abuse of children. Furthermore, unlike defendant who was convicted of sexual abuse of two victims, these statutes generally provide that a life sentence is appropriate for a *single* offense. See Ala. Code § 13A-5-6(a)(4), (d) (2012) (Class A felony

criminal sex offense involving a child is punishable by mandatory imprisonment for at least 20 years, and "when the defendant was 21 years of age or older and the victim was six years of age or less at the time the offense was committed, the defendant *shall be* sentenced to life imprisonment without the possibility of parole." (Emphasis added.)); Idaho Code Ann. § 18-1508 (West 2012) (for lewd conduct with minor under 16 "shall be guilty of a felony and shall be imprisoned in the state prison for a term of not more than life"); Mo. Ann. Stat. § 566.030.2(2) (West 2012) ("Forcible rape or an attempt to commit forcible rape" is a felony requiring a minimum sentence of five years' imprisonment unless: "(2) The victim is a child less than twelve years of age, in which case the required term of imprisonment is life imprisonment without eligibility for probation or parole until the defendant has served not less than thirty years of such sentence or unless the defendant has reached the age of seventy-five years and has served at least fifteen years of such sentence, unless such forcible rape is described under subdivision (3) of this subsection."); Mont. Code Ann. § 45-5-502(3) (2012) (for sexual assault, "(3) If the victim is less than 16 years old and the offender is 3 or more years older than the victim or if the offender inflicts bodily injury upon anyone in the course of committing sexual assault, the offender shall be punished by life imprisonment or by imprisonment in the state prison for a term of not less than 4 years"); Utah Code Ann. § 76-5-404.1(5)(b), (5)(c) (West 2012) ("(5) Aggravated sexual abuse of a child is a first[-]degree felony punishable by a term of imprisonment of *** (b) *** life without parole, if the trier of fact finds that during the course of the commission of the aggravated sexual abuse of a child the defendant caused serious bodily injury to another; or (c) life without parole, if the trier of fact finds that at the time of the commission of the aggravated sexual abuse of a child, the defendant was previously convicted of a grievous sexual offense."); see *State v. Finchum*, 2012 UT App 331, 290 P.3d 938 (*per curiam*) (sentence of 15 years to life for two counts of aggravated sex abuse); Md. Code Ann., Crim. Law § 3-303(d)(4)(i) (West 2012) (a person 18 years or older who sexually abuses someone under 13 years of age "is guilty of the felony of rape in the first degree and on conviction is subject to imprisonment for not less than 25 years and not exceeding life without the possibility of parole").

¶ 58     Moreover, defendant's arguments regarding national consensus largely rest on a distinction between repeat offenders who have been previously convicted and those who committed multiple offenses but had no prior convictions. Several states, and the federal code, mandate life sentences for subsequent convictions. See, *e.g.*, 18 U.S.C. § 2241(c) (2012) (mandatory life for sex offender with previous conviction); Iowa Code Ann. §§ 902.1, 902.14(1) (West 2012) (mandatory life without parole as a Class A felony); Texas Penal Code Ann. § 12.42(c)(2) (West 2012) (mandating life sentence for second conviction of indecency with a child); Mich. Comp. Laws Ann. § 750.520b (West 2012) (life without parole). Defendant contends that this reflecting distinction is necessary in order to recognize the potential for rehabilitation. This, however, ignores the tendency of sex offenders to repeat their offenses and the "frightening and high risk of recidivism." *McKune v. Lile*, 536 U.S. 24, 34 (2002). Furthermore, the provision of the Code mandating a life sentence is not triggered by a range of multiple sex offenses, such as child pornography or lewd conduct. Instead, the applicable provision of the Code mandates a life sentence only if there is predatory criminal sexual assault of two or more children. 720 ILCS 5/11-1.40(b)(1.2) (West

2012).

¶ 59    Nonetheless, as *Huddleston* observed, Illinois is not alone in imposing a mandatory life sentence for the first conviction. *Huddleston*, 212 Ill. 2d at 140, 816 N.E.2d at 341. In particular, *Huddleston* pointed to the scheme of Louisiana. After *Huddleston*, the Supreme Court reviewed the statutory scheme of Louisiana–leaving Louisiana's mandatory life sentence for sex offenders intact. *Kennedy v. Louisiana*, 554 U.S. 407 (2008).

¶ 60    In *Kennedy*, Louisiana imposed the death penalty on a defendant convicted of raping a child. The Louisiana statute in question provided that a defendant convicted of raping a child under the age of 12 years shall be punished either by death or by life imprisonment at hard labor without benefit of parole. *Kennedy*, 554 U.S. at 416; La. Rev. Stat. Ann. § 14:42 (West 1997). *Kennedy* held that the death penalty was not a proportionate response and found that "the death penalty should not be expanded to instances where the victim's life was not taken." *Kennedy*, 554 U.S. at 437.

¶ 61    *Kennedy* resulted in the portion of the Louisiana statute providing for the imposition of the death penalty being stricken, but the mandatory life sentence remained intact. Indeed, on remand, Kennedy was resentenced to life imprisonment at hard labor without benefit of parole. *State v. Kennedy*, 994 So. 2d 1287, 1288 (La. 2008) (*per curiam*). After *Kennedy*, Louisiana has continued to impose mandatory life sentences when a child has been raped. See *State v. Davis*, 995 So. 2d 1211, 1212 (La. 2008) (*per curiam*); *State v. Hough*, 103 So. 3d 477, 479 (La. Ct. App. 2012). At no point did *Kennedy* criticize the propriety of a mandatory life sentence for a first-time sex offense. If not a tacit approval of mandatory life sentences for a single sex offense, *Kennedy* is incongruous with defendant's assertion that such mandates are contrary to national consensus.

¶ 62    Similarly, an independent examination of the sentence reveals it to be neither cruel nor unusual. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2021. Defendant was convicted of sexual abuse of two children. The penological goals more fully examined in *Huddleston* justify defendant's sentence.

¶ 63    Accordingly, the judgment of the circuit court is hereby affirmed.

¶ 64    Affirmed.